O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VINCENT DAVID MENDOZA, | ) | NO. CV 14-6457-MAN |
| Petitioner, | ) | MEMORANDUM OPINION AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN SOTO, | ) | |
| Respondent. | ) | |
| | ) | |

On August 18, 2014, Petitioner, a prisoner in state custody, filed a habeas petition pursuant to 28 U.S.C. § 2254 ("Petition").  Respondent filed an Answer in response and lodged the pertinent state record ("Lodg.").  Petitioner thereafter filed a Traverse.  Both parties have consented to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The matter is submitted and ready for decision.

## PRIOR PROCEEDINGS

In December 19, 2011, a Los Angeles County Superior Court jury found Petitioner guilty of:  kidnapping (California Penal Code § 207(a)); attempted murder (California Penal Code §§ 187. 664); assault with a deadly weapon (California Penal Code § 245(a)(1)); and conspiracy to commit

murder (California Penal Code § 182(a)(1)).  The jury also found various enhancement allegations to be true.  (Lodg. No. 1, Clerk's Transcript ("CT") 241-50).  Petitioner was sentenced to 25 years to life plus a determinate term of 11 years.  (CT 295-301.)

Petitioner appealed, and he raised the same claim that he alleges in this action.  (CT 302; Lodg. Nos. 3-5.)  On April 22, 2013, the California Court of Appeal affirmed Petitioner's convictions in a written, reasoned decision.  (Lodg. No. 6.)  Petitioner filed a petition for review in the California Supreme Court, again raising his present claim.  (Lodg. No. 7.)  On July 10, 2013, the California Supreme Court denied the petition for review summarily.  (Lodg. No. 8.)

**SUMMARY OF THE EVIDENCE AT TRIAL**

The victim, Christina Martinez, testified about the following events:  On August 4, 2009, Martinez was visiting her boyfriend's home in Bellflower.  At approximately 2:00 a.m., Petitioner, co-defendant Edward Meraz, and Jose Miguel Ayala showed up at the house to give Martinez a ride back home.  (Lodg. No. 2, Reporter's Transcript ("RT") 1225.)  Martinez had known Ayala (who was a cousin of her boyfriend) for approximately three months.  She got Ayala a job promoting clubs and events, as she did, and they worked together.  She saw him three times a week and knew him fairly well.  Martinez had been to the beach with Ayala approximately five times before that night without any problems.  Martinez and Ayala were close; they had a father-daughter type relationship, and he took her places she needed to go.  (RT 1229, 1281, 1283-84.)  Martinez had met Petitioner and Meraz within the last several weeks, and she had not had any issues with either man.  (RT 1281.)  Martinez had hung out with all three men a couple times at Petitioner's house, and she believed the three men were friends.  (RT 1282.)

In front of Petitioner and Meraz, Ayala said that they would "stop by the beach for a little bit" and "stop by his girlfriend's house to pick something up."  (RT 1226-27.)  Martinez thought this would be fine, given that the beach was nearby and they went there once in a while.  She did

1  not have any reason to think anything bad would happen if she joined the three men.  (RT 1229,
2  1286.)

3

4      Martinez and the three men got into a green Mitsubishi Eclipse and drove to the home of
5  Ayala's girlfriend.  Martinez stayed in the car while Ayala went to speak to his girlfriend.  When
6  he came back, they drove off.  Ayala was driving the car, Petitioner was in the front passenger
7  seat, Martinez was seated in the back behind Ayala, and Meraz was seated in the back next to her.
8  (RT 1227-30.) At some point, Martinez realized that they were not heading toward the beach and,
9  instead, were heading toward Whittier.  She asked where they were going, and none of the men
10  responded.  (RT 1230-31.)  Neither Petitioner nor Meraz questioned where they were going.  (RT
11  1232.)

12

13      Martinez realized that they were driving toward a canyon.  Ayala and Petitioner had a
14  conversation, but Martinez could not understand what they said.  Ayala then said to Martinez, "I'm
15  going to have to tie your hands."  Martinez protested, and Ayala repeated that he had to tie her
16  hands and said, "You're going to have to trust me."  Martinez resisted and pulled her hands
17  toward her chest.  (RT 1231-32, 1289-90.)  Ayala stopped the car, turned around, put a knife to
18  the back of Martinez's neck, and said, "You better stop moving or I'm going to fucking kill you."
19  (RT 1232.)  Martinez started crying and asked, "why are you doing this to me," but nobody
20  answered.    Meraz grabbed her hands and tried to tie them, but Martinez was fidgeting, so
21  Petitioner turned around to help Meraz tie her hands by holding Martinez's hands in place.  (RT
22  1233.)

23

24      Meraz and Petitioner succeeded in tying Martinez's hands with a rope, and Ayala stopped
25  the car.  Petitioner pulled out a syringe and asked Ayala where he wanted Petitioner to inject
26  Martinez, and the two men discussed this.  Petitioner than injected a needle into Martinez's neck
27  five to ten times.  He turned around, pulled her hair out of the way, and injected the needle into
28  her neck and she felt a warm rush.  Petitioner then would remove the needle, re-fill the syringe,

1 and re-inject her.  No one instructed him how to do this.  Martinez cried, told the men to stop, and
2 asked why they were doing this, but the men did not respond.  Martinez felt a burning sensation,
3 was nauseous, could not breathe, and had a very fast heartbeat, and she began to choke and gag.
4 (RT 1234-39, 1243, 1271, 1514.)

5

6   By this point, Ayala had gotten out of the car.  Meraz grabbed Martinez's hair and pushed
7 her out of the car toward Ayala, and she "stumbled" out of the car.  (RT 1239-40, 1245, 1314-15.)
8 Ayala hugged Martinez and said, "Do you trust me?  Do you trust me?  If you trust me nothing's
9 going to happen to you."  Martinez was scared and crying and kept telling the men, "Please don't
10 hurt me."  (RT 1245-46.)  Ayala untied Martinez's hands, while Petitioner and Meraz stood six to
11 eight feet away by the car.  (RT 1246-47.)  Ayala told Martinez she was going to wake up
12 somewhere else; Petitioner and Meraz did not say anything.  Ayala pushed Martinez to the ground
13 and then the three men started kicking and punching her all over her body and head.  Someone
14 hit her in the back of the head with a hard object, and she blacked out for a few seconds.  (RT
15 1248-49, 1324-25.)

16

17   When Martinez regained consciousness, she heard Meraz, say, "She's out.  She's out."  Two
18 of the men (she did not know which two) picked her up and threw her down the side of a cliff.
19 (RT 1250-51, 1325.)  She estimated that she fell approximately 12 feet from the top of the cliff.
20 (RT 1252, 1522.)  All three men came down to where Martinez had landed, and Ayala said, "You
21 tried to set me up.  You tried to kill me.  And this is what's going to happen to you."  Petitioner
22 and Meraz were standing behind Ayala.  (RT 1252-53.)  As Petitioner and Meraz stood by, Ayala
23 pulled out a blue knife and sliced Martinez's throat three times.  The three men climbed back up
24 the cliff.  (RT 1253-55.)

25

26   Martinez touched her neck and said, "Oh my God, I'm bleeding."  Meraz said, "She's still
27 talking."  Martinez looked up and saw Ayala wave his hand.  Petitioner then came back down the
28 hillside, pulled out a silver knife, and stabbed Martinez twice in the right side of her neck, near her

1   ear.  (RT 1255-58.)

2

3          Martinez pretended to be dead and let her body slide down the rest of the hill, although

4   she grabbed onto a branch as she slid lower into the canyon.  (RT 1259.)  She waited until the

5   men left and it was quiet, then she took her shirt off and tied it around her neck to stop the

6   bleeding.  (RT 1260.)  She climbed back up to the road and tried to run down it, but was tired.

7   She then saw the Mitsubishi turn around and return, so she jumped over a berm and hid in some

8   trees until the three men left.  (RT 1260-61.)  Martinez saw some houses on the top of the hill and

9   climbed uphill through bushes and trees to reach them.  She pounded on the window of the first

10  house she saw and set off the alarm.  (RT 1261-63.)

11

12         Arlene Boatright testified that she was asleep in her home at approximately 3:30 a.m. on

13  August 4, 2009, when she heard her alarm and a knock at her door.  She heard a woman's voice

14  say that her throat had been cut.  Boatright was worried it was her neighbor's daughter, so she

15  turned off the alarm and opened the door.  The girl at the door had a red bra and shorts on and

16  a sock on one foot.  She had her shirt tied around her neck and was holding it, and her hands

17  were full of blood.  The girl said that her throat had been slit and she knew the boys "that she

18  came with and the car she was in."  Boatright called the police.  (RT 1528-30.)

19

20         Martinez testified that, when the police responded, she was able to provide them with the

21  first three characters of the Mitsubishi's license plate.  (RT 1263-64.)  She was taken to the

22  hospital, where she remained for two days.  The wounds she sustained in her neck and throat,

23  when Petitioner stabbed her and Ayala slashed her, were closed by stitches.[1]  She had a bleeding

24  cut on the top of her head that was closed by ten staples.  Her eyes, nose, and the sides of her

25  face were swollen and her lips were "busted."  (RT 1264-66.)

26

27  ─────────────

28         [1]       Photographs depicted stab wounds in the upper left area behind Martinez's ear and
    in the upper left area above her collar bone where Petitioner stabbed her.  (RT 1267.)

5

1    Police Officer Tom Stoner responded to the call. (RT 1543.)  He observed that Martinez

2    had a large amount of blood on her hands and clothing, scratches and scrapes on her legs, cuts

3    and abrasions on her head, and leaves, twigs, branches, and debris in her hair and clothing.  She

4    was missing her shoes and one sock. (RT 1544.)  He drove around the canyon area searching

5    for her missing clothing items but did not find them. (RT 1545.)  Officer Stoner heard the

6    description Martinez gave to other officers of the suspect vehicle, and before he left, he decided

7    to do one more search of the canyon area.  He stopped to confer with another officer and

8    observed the green Mitsubishi drive by, with three men in it, as Martinez had described.  He

9    initiated a traffic stop of the car.  RT 1546-49.)  The three men inside were extracted and taken

10   to jail.  Officer Stoner observed a shovel, some rope, and paper towels in the back seat of the car.

11   (RT 1549-51, 1816.)  Subsequently, another officer located a backpack in a shrub adjacent to the

12   canyon road that matched the description provided by Martinez of the backpack she left in the

13   Mitsubishi.  (RT 1556-57.)  When the Mitsubishi was searched pursuant to a warrant, officers

14   found in it rope, a long-handled shovel, a collapsible shovel, gloves, a flashlight, a bulletproof vest,

15   and a sweatshirt that had droplets of blood on it.  (RT 1558-60, 1829-31, 1951-52.)

16

17   Samantha Montgomery, Ayala's girlfriend, testified that around 4:00 a.m. on the morning

18   of August 4, 2009, Ayala, Petitioner, and Meraz returned to her house in the Mitsubishi.  She

19   talked to Ayala briefly "found out what happened," and took a bag from him.  Montgomery kept

20   the bag at her house for a while, then she dropped it off in a dumpster near a Walmart to which

21   she had been planning to go.  (RT 1535-40.)  The next day, when police officers came to her

22   house, she took them to the dumpster.  (RT 1538.)

23

24   The police recovered from this bag two used syringes with liquid in them, which had bent

25   needles, and seven unused and capped syringes, two knives with dried blood on them (which

26   matched the descriptions provided by Martinez), a pair of black gloves with dried blood on them,

27   and white latex gloves with blood on them.  (RT 1561-64, 1952-58.)  The police also recovered

28   from the bag documents belonging to Martinez, including her Social Security card, her State of

California benefits card, and a traffic ticket issued to her.  (RT 1565.)

Petitioner and Meraz did not testify.  They did not present any evidence after the prosecution rested.  (RT 1965-66.)

## PETITIONER'S HABEAS CLAIM

Petitioner contends that he has been deprived of due process, because the evidence was insufficient to show that he had the specific intent to kill, as needed to support his convictions for attempted murder and conspiracy to commit murder.  He asserts that the testimony of the victim showed that he lacked the requisite specific intent to kill and did not share the criminal intent of the main perpetrator.  Petitioner argues that his conviction rests on "emotional speculation." (Petition at 5.)[2]

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See also* Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("By its terms § 2254(d)

---

[2]     Although Petitioner frames his claim somewhat differently in the Petition (at 5), it is clear that Petitioner intends to raise the claim he exhausted in the state courts.  (*See* Petition at 5 and attached copy of petition for review; Traverse at 3, 17-18.)  If, in fact, Petitioner is attempting to raise a different claim (a conclusion his Traverse seems to dispel), the Petition is fully unexhausted and must be dismissed.  To avoid dismissal, and given the evidence of Petitioner's intent to raise the claim he exhausted in the state courts, the Court has construed the Petition liberally to state the sole sufficiency of the evidence claim exhausted by Petitioner.

bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

The Petition is governed by the Section 2254(d) standard of review, because the claim raised by Petitioner was resolved on its merits in Petitioner's state appellate proceedings. Petitioner presented his claim to the California Court of Appeal and the California Supreme Court on direct review: the California Court of Appeal denied relief on the merits in a reasoned decision; and the California Supreme Court summarily denied the petition for review.  The Court looks through the California Supreme Court's silent denial to the last reasoned decision, *i.e.,* that of the California Court of Appeal.  Cannedy v. Adams, 706 F.3d 1148, 1158-59 (9th Cir.), amended by 733 F.3d 794, *cert. denied*, 134 S. Ct. 1001 (2013); *see also* Berghuis v. Thompkins, 130 S. Ct. 2250, 2259 (2010) (when claims were raised on appeal and denied by state court of appeal on their merits in a reasoned decision, and the state supreme court denied discretionary review, the "relevant state-court decision" for purposes of Section 2254(d) review was the state court of appeal decision).  The Court therefore must evaluate Petitioner's claims under the Section 2254(d) standard of review.

Clearly established federal law, for purposes of Section 2254(d)(1) review, means Supreme Court holdings in existence at the time of the state court decision in issue.  Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011); Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011); Richter, 131 S. Ct. at 785.  Under Section 2254(d)(1)'s first prong, a state court decision is "contrary to" federal law if the state court applies a rule that contradicts the relevant Supreme Court holdings or reaches a different conclusion than that reached by the high court on materially indistinguishable facts. Price v. Vincent, 123 S. Ct. 1848, 1853 (2003).  "Thus, the 'contrary to' prong requires a direct and irreconcilable conflict with Supreme Court precedent."  Murray v. Schriro, 745 F.3d 984, 997 (9th Cir. 2014).  Section 2254(d)(1)'s second, "unreasonable application," prong constitutes an objective standard that is not satisfied merely by finding that a state court erred in applying clearly established federal law.  Richter, 131 S. Ct. at 785; Lockyer v. Andrade, 123 S. Ct. 1166, 1174

1    (2003). "The question . . . is not whether a federal court believes the state court's determination
2    was incorrect but whether that determination was unreasonable — a substantially higher
3    threshold." Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007); see also Xiong v. Felker, 681 F.3d
4    1067, 1074 (9th Cir. 2012) (a finding that the state court was incorrect or erroneous is
5    insufficient, because the Section 2254(d)(1) "inquiry is strictly limited to whether the state court's
6    application of clearly established Supreme Court precedent" was objectively unreasonable).

7

8          A state court has made an "unreasonable determination of the facts" within the meaning
9    of Section 2254(d)(2) when either its findings were not supported by substantial evidence in the
10   state court record or its fact-finding process was unreasonably deficient. See Hibbler v. Benedetti,
11   693 F.3d 1140, 1146 (9th Cir. 2012).   However, the federal courts "must be particularly
12   deferential to our state-court colleagues" in conducting section 2254(d)(2) review.   Taylor v.
13   Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).   A state court's "factual determination is not
14   unreasonable merely because the federal habeas court would have reached a different conclusion
15   in the first instance." Wood v. Allen, 130 S. Ct. 841, 849 (2010).  The petitioner must show that
16   the state court's factual findings were not merely incorrect but were "'objectively unreasonable.'"
17   Hibbler, 693 F.3d at 1146 (citations omitted).   To succeed, the petitioner must convince the
18   federal court not only that it would reverse in similar circumstances on direct review but also "that
19   an appellate panel, applying the normal standards of appellate review, could not reasonably
20   conclude that the finding is supported by the record." Taylor, 366 F.3d at 1000.  "A state court's
21   decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable
22   so long as the state court could have reasonably concluded that the evidence already adduced
23   was sufficient to resolve the factual question."   Hibbler, 693 F.3d at 1147; see also Earp v.
24   Ornoski, 431 F.3d 1158, 1170 (9th Cir. 2005) (a state court is not required to hold an evidentiary
25   hearing when a factual question can be resolved based on the evidence of record).

26

27         "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's
28   decision," habeas relief is precluded by Section 2254(d). Richter, 131 S. Ct. at 786 (citation

1  omitted); *see also id.* at 786-87 (a petitioner is required to prove that the state decision "was so

2  lacking in justification that there was an error well understood and comprehended in existing law

3  beyond any possibility for fairminded disagreement").  "Under § 2254(d), a habeas court must

4  determine what arguments supported or, [in the case of a silent denial of relief], could have

5  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

6  could disagree that those arguments or theories are inconsistent with the holding of a prior

7  decision of this Court."  *Id.* at 786.  A federal court has the authority to issue habeas relief only

8  "where there is no possibility fairminded jurists could disagree that the state court's decision

9  conflicts with [the Supreme Court's] precedents."  *Id.*; *see also* <u>Murray</u>, 745 F.3d at 998 ("The

10  deferential standard imposed under AEDPA cloaks a state court's determination with

11  reasonableness, so long as 'fairminded jurists could disagree' as to whether a claim lacks merit.")

12  (citation omitted).  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court

13  rulings,'. . . and 'demands that state-court decisions be given the benefit of the doubt.'"  <u>Renico</u>

14  <u>v. Lett</u>, 130 S. Ct. 1855, 1862 (2010) (citations omitted).  "The petitioner carries the burden of

15  proof."  <u>Pinholster</u>, 131 S. Ct. at 1398.

16

17                                                    **DISCUSSION**

18

19  **I.      The Clearly Established Federal Law That Governs Petitioner's Claim**

20

21          The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant

22  may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to

23  constitute the crime with which he is charged."  <u>In re Winship</u>, 90 S. Ct. 1068, 1073 (1970).  The

24  Supreme Court announced the federal standard for determining the sufficiency of the evidence

25  to support a conviction in <u>Jackson v. Virginia</u>, 99 S. Ct. 2781 (1979).

26

27          Under <u>Jackson</u>, "the relevant question is whether, after viewing the evidence in the light

28  most favorable to the prosecution, *any* rational trier of fact could have found the essential

1    elements of the crime beyond a reasonable doubt." Jackson, 90 S. Ct. at 2789 (emphasis in

2    original); see also Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam) (a habeas court "may set

3    aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could

4    have agreed with the jury").  "Put another way, the dispositive question under Jackson is 'whether

5    the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"

6    Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc) (quoting Jackson); see also

7    Drayden v. White, 232 F.3d 704, 709–10 (9th Cir. 2000) (explaining that the evidence may be

8    sufficient to support a jury's finding even if it does not "compel" that finding).

9

10    A habeas court reviewing a sufficiency of the evidence claim must consider all evidence

11    admitted at trial, notwithstanding a contention by a petitioner that some of the admitted evidence

12    should have been excluded.  McDaniel v. Brown, 130 S. Ct. 665, 672 (2010) (per curiam).

13    "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'"

14    Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). The reviewing court need

15    not decide whether it would have found the trial evidence sufficient or scrutinize "the reasoning

16    process actually used by the fact-finder."  Jackson, 99 S. Ct. at 2788–89 & n.13.  Jackson also

17    does not require that the prosecutor affirmatively "'rule out every hypothesis except that of guilt.'"

18    Wright v. West, 112 S. Ct. 2482, 2492 (1992) (citation omitted).  When the factual record

19    supports conflicting inferences, the federal court must presume -- even if it does not affirmatively

20    appear on the record -- that the trier of fact resolved any such conflicts in favor of the prosecution

21    and defer to that resolution.  Jackson, 99 S. Ct. at 2793.

22

23    Ultimately, a petitioner "faces a heavy burden when challenging the sufficiency of the

24    evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408

25    F.3d 1262, 1274 (9th Cir. 2005).  The habeas court must "preserve 'the factfinder's role as

26    weigher of the evidence,'" Brown, 130 S. Ct. at 674 (citation omitted), and, therefore, must accord

27    "near-total deference" to a jury's credibility determinations, Bruce v. Terhune, 376 F.3d 950, 957

28    (9th Cir. 2004); see also Smith, 132 S. Ct. at 4 (it "is the responsibility of the jury — not the court

1    — to decide what conclusions should be drawn from the evidence admitted at trial"); Schlup v.

2    Delo, 115 S. Ct. 851, 868 (1995) ("under *Jackson*, the assessment of the credibility of witnesses

3    is generally beyond the scope of review.").   "*Jackson* leaves juries broad discretion in deciding

4    what inferences to draw from the evidence presented at trial," and it requires only that they draw

5    "'reasonable inferences from basic facts to ultimate facts.'"   Coleman v. Johnson, 132 S. Ct. 2060,

6    2064 (2012) (*per curiam*) (citation omitted).   Moreover, the federal habeas court must "apply the

7    standards of *Jackson* with an additional layer of deference" under Section 2254(d)(1).   Juan H.,

8    408 F.3d at 1274; *see also* Johnson, 132 S. Ct. at 2062 ("We have made clear that *Jackson* claims

9    face a high bar in federal habeas proceedings because they are subject to two layers of judicial

10   deference.").   This doubly deferential standard limits the federal habeas court's inquiry to whether

11   the state court's rejection of a sufficiency of the evidence challenge was an objectively

12   unreasonable application of Jackson.   Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011); *see*

13   *also* Johnson, 132 S. Ct. at 2062.

14

15   **II.    Deference Must Be Accorded To The State Court Decision**

16

17        Petitioner argues that the evidence is insufficient to show that he possessed the intent to

18   kill Martinez -- an element that is required to support his convictions for attempted murder and

19   conspiracy to commit murder.   Petitioner argues that both the trial record and new facts asserted

20   by him for the first time in his recently-filed Traverse establish reasonable doubt as to whether

21   he possessed the intent to kill.

22

23        **A.    The Trial Evidence On Which Petitioner Relies**

24

25        With respect to Martinez's trial testimony that Petitioner provided assistance to Meraz in

26   tying Martinez's hands in the car, Petitioner asserts that Martinez's testimony showed that he had

27   been "non-involved" up to that point.   He posits that the jury could have found his motive in

28   assisting Meraz was to "prevent [Martinez's] immediate murder by Ayala."   According to Petitioner,

12

1   because Martinez's hands were tied successfully with his assistance, "that immediate and brutal

2   murder was avoided," and thus, reasonable doubt existed regarding Petitioner's intent. (Traverse

3   at 6-7.)[3]

4

5       Petitioner also notes Martinez's testimony, on cross-examination, that when Ayala untied

6   her hands after she was pushed from the car, she thought this was "strange" and wondered if he

7   was playing a "sick joke," though she did not know what to expect. (RT 1526.) Petitioner argues

8   that this testimony by Martinez established the "possibility" that he "was also unsure of the

9   situation." (Traverse at 7.)

10

11       Finally, Petitioner notes there was evidence adduced at trial that Martinez told the police

12   people said Petitioner was a "follower." (Petitioner, attached petition for review at 7; Traverse at

13   13, citing RT 1505.) Petitioner argues that this testimony shows he "only" "was along to help

14   Ayala" in some way, negates finding that he had the specific intent to kill, and shows that "there

15   was no conspiracy."

16

17

18   _____

19       [3]    Petitioner claims Martinez testified that "she wasn't sure if [Petitioner] even wanted
    to stick her with the syringe," and he argues that this testimony shows he was "hesitant" and

20   "reluctant" to inject Martinez. (Petition, attached petition for review at 7, relying on RT 1515.)
    Petitioner's characterization of Martinez's testimony is misleading. When defense counsel asserted

21   that, "in fact, [Petitioner] didn't want to stick you with the needle[,] did he?," Martinez initially
    responded, "I'm not sure." (RT 1515.) However, she immediately clarified her response by

22   adding, "I mean I didn't see him say no. I didn't see him put up a fight." (*Id.*)

23
        Petitioner also claims Martinez testified that, when he came back down the cliff, he

24   attempted "to calm her to protect her from Ayala coming down and killing her himself." (Petition,
    attached petition for review at 7, relying on RT 1523.) Again, Petitioner's description of Martinez's

25   testimony is incomplete and inaccurate. Martinez was asked by defense counsel if "when
    [Petitioner came down he was trying to get [her to] calm down because he was concerned that

26   [Ayala] would come back," Martinez responded: "I would assume so. I mean I wouldn't know
    how to answer that." (RT 1523.) However, Martinez then immediately testified that she did not

27   recall whether Petitioner tried to calm her down or told her to be quiet or Ayala would come down

28   and kill her. (*Id.*)

1   **B.   The New Alleged Facts On Which Petitioner Relies**

2

3   Petitioner also relies on asserted facts *not* presented to the jury, including preliminary

4   hearing testimony that was not used to question trial witnesses or otherwise entered into evidence

5   at trial and his own allegations made for the first time in this federal habeas proceeding.[4]  For

6   example, Petitioner notes that, at the preliminary hearing, Martinez testified that she was not sure

7   who initially produced the syringe, although she first saw it in Petitioner's hands.  (CT 10.)

8   Petitioner contends this preliminary hearing testimony, which was not provided to the jury,

9   establishes that it was an "open question" whether Ayala coerced Petitioner to inject Martinez.

10  (Traverse at 7-8.)

11

12  Petitioner complains that no toxicology evidence was presented to show what was in the

13  syringes, and he alleges that his public defender asked him what was in the syringes and advised

14  him that, to counsel's knowledge, the toxicology tests had come back negative.  According to

15  Petitioner, this off the record statement by his counsel shows that Petitioner's intent was

16  ambiguous and suggests that Ayala perhaps was playing a "sick joke," and thus, the question of

17  Petitioner's intent remains open. (Traverse at 8-9.)

18

19  Petitioner alleges that:  he was only hanging out with Ayala because Ayala had a car;

20  Ayala's acts that night were "spontaneous and delusional"; Petitioner no intent to kill anyone and

21  never conspired to do so; and with respect to the evidence that the men returned to the scene

22  with shovels and other items to bury Martinez, Petitioner was "too afraid of Ayala to back out" but

23  assumed Martinez was "still alive and mobile and thus the burying would not have occurred."

24  (Traverse at 15, 17.)

25

26

27       [4]     As noted earlier, Petitioner did not testify or present any evidence at trial.  He raised

28  his present claim on direct appeal, and thus, it was predicated and exhausted based solely upon
    the trial record.

Petitioner also alleges that, when he climbed back down the hill and stabbed Martinez in the neck twice, he did not use a "killing blow" and, instead, saved her life by whispering to her to calm down or Ayala would return.  He also claims he stabbed Martinez only because Ayala was watching.  (Traverse at 14-16.)  Petitioner argues that these newly-asserted alleged facts prove that reasonable doubt existed as to his intent. (Traverse at 14-15.)

## A.    **The State Court Decision**

The California Court of Appeal summarized California law regarding the requisite intent to kill as follows:

> In order for a defendant to be convicted of attempted murder, the prosecution must prove he or she "acted with specific intent to kill that victim. [Citation.]" (*People v. Smith* (2005) 37 Cal. 4th 733, 739 (*Smith* ).)  Express malice, rather than implied malice, is required;  the defendant must intend the death of the victim or know to a substantial certainty that death will be the result of his or her actions.  (*Ibid.*)  Similarly, in order to convict for conspiracy to commit murder, the jury must find the defendant had a specific intent to kill; such a conviction cannot be based on implied malice.  (*People v. Swain* (1996) 12 Cal. 4th 593, 607.)  As there is rarely direct evidence of intent to kill, express malice may be "inferred from the defendant's acts and the circumstances of the crime. [Citation.]" (*Smith,* at p. 741.)  If a jury concludes a defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill can be inferred.  (*Ibid.*)

> "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could

1   find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999)

2   20 Cal. 4th 1, 11.)

3

4   (Lodg. No. 6 at 3-4.)

5

6        Applying these standards, the California Court of Appeal found that the evidence was

7   sufficient to support a finding that Petitioner possessed the requisite intent to kill.  The state

8   appellate court reasoned as follows:

9

10            The record establishes that [Petitioner] was present at all times from the

11       point Ayala and Meraz picked up Martinez to the moment they left her at the base

12       of the canyon bleeding from her neck and head.  Martinez testified that at no point

13       did [Petitioner] question what was going on or what Ayala intended to do.  Martinez

14       stated [Petitioner] held her hands while Meraz bound them.  She further testified

15       that [Petitioner] took out a syringe and forcefully injected her five to ten times in

16       the neck, causing her to have difficulty in breathing.  In addition, the jury could

17       have reasonably inferred that [Petitioner] was involved in beating Martinez after she

18       was thrown to the ground at the top of the canyon, before she was then thrown off

19       a cliff.   Ayala proceeded to grab her and slice her throat several times while

20       [Petitioner] stood nearby.  When [Petitioner] and the other two men realized she

21       was still alive, [Petitioner] climbed back down into the canyon.  He then approached

22       Martinez from behind and stabbed her in the neck two times.  This conduct alone

23       constituted substantial evidence, such that a reasonable trier of fact could find

24       appellant harbored the requisite intent to kill Martinez. (*People v. Rodriguez, supra,*

25       20 Cal. 4th at p. 11.)  Using a knife to stab another person in the neck multiple

26       times, then leaving that person at the base of a canyon, alone and bleeding,

27       provides a sufficient basis for an inference of intent to kill. (*Smith, supra,* 37 Cal.

28       4th at p. 741.)   We conclude sufficient evidence supports the finding that

1   [Petitioner] acted with the intent to kill Martinez as required for his convictions of

2   attempted murder and conspiracy to commit murder.

3

4   (Lodg. No. 6 at 4-5.)

5

6   **B.**   **The State Court Reasonably Determined That Sufficient Evidence**

7   **Supported Petitioner's Convictions For Attempted Murder And**

8   **Conspiracy.**

9

10   In his Traverse, Petitioner asserts that his convictions are "unreliable," because "these

11   convictions are based on an unreasonable determination of the facts in light of the evidence

12   presented in the state court proceeding." (Traverse at 2.) Petitioner misunderstands the Section

13   2254(d)(2) standard of review, which focuses not on whether a *conviction* is reliable but, instead,

14   whether the state court decision rejecting a habeas claim rests on an unreasonable determination

15   of fact in the light of the evidence presented in the state courts.  Petitioner does not contend that

16   the California Court of Appeal made any unreasonable factual determination; indeed, he does not

17   identify *any* allegedly erroneous factual determination made by any state court.   Rather,

18   Petitioner's habeas argument is that:  some of the evidence presented at trial could have been

19   interpreted to create reasonable doubt as to his intent; and there are facts that were not

20   presented at trial which, if considered here, show that he lacked the required intent.  Petitioner's

21   latter contention plainly does not implicate Section 2254(d)(2), as it rests on alleged facts that

22   were never presented at trial or in Petitioner's direct appeal (and which, moreover, are

23   inadmissible here, as discussed *infra*).  Petitioner's contention with respect to the sufficiency of

24   the trial evidence to support the jury's finding of intent to kill is more properly addressed under

25   the rubric of Section 2254(d)(1), which the Court does below.

26

27   Before proceeding to its Section 2254(d)(1) analysis, however, the Court notes that the

28   host of new facts alleged by Petitioner in his Traverse will not be considered in connection with

1  the Court's Section 2254(d)(1) analysis.  None of these alleged facts were presented to the jury

2  at Petitioner's trial, given his election not to testify and his failure to present any other evidence

3  in his defense.  Moreover, the purported new facts were not presented to the California Court of

4  Appeal or the California Supreme Court when Petitioner exhausted his present claim.  As this case

5  is governed by the Section 2254(d) standard of review and these alleged facts were not a part of

6  the state record, they may not be considered here.  *See* Pinholster, 131 S. Ct. at 1398 (habeas

7  review under Section 2254(d)(1) is limited to the record before the state court that adjudicated

8  the claim on the merits); *see also* Gulbrandson v. Ryan, 738 F.3d 976, 993-94 (9th Cir. 2013)

9  (when a state court has denied habeas claims on their merits, Pinholster precludes "further factual

10  development of these claims" to determine whether Section 2254(d)(1) or (d)(2) is satisfied), *cert.*

11  *denied* (2014); Stokley v. Ryan, 659 F.3d 802, 809 (9th Cir. 2011) (noting "*Pinholster*'s limitation

12  on the consideration of [a petitioner's] new evidence . . . in federal habeas proceedings").

13

14  With respect to its review pursuant to Section 2254(d)(1), the Court has carefully reviewed

15  the record and concludes that the finding of the California Court of Appeal -- that sufficient

16  evidence was presented at trial to support a finding that Petitioner possessed the required intent

17  to kill -- is objectively reasonable under the clearly established federal law.

18

19  Under California law, to convict a defendant of attempted murder and conspiracy to commit

20  murder, a jury must find a specific intent to kill and the commission of a direct but ineffectual act

21  towards accomplishing the intended killing.  Smith, 37 Cal. 4th at 739; People v. Swain, 12 Cal.

22  4th 593, 607 1996).  Implied malice is insufficient.  *Id.; see also, e.g.,* People v. Lee, 31 Cal. 4th

23  613, 623 (2003); People v. Chinchilla, 52 Cal. App. 4th 683, 690 (1997).  As there rarely is direct

24  evidence of a specific intent to kill, a finding that this element has been established usually must

25  be "derived from all the circumstances of the attempt, including the defendant's actions."  *Id.*

26  "[I]t is well settled that intent to kill . . ., the mental state required to convict a defendant of

27  attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the

28  crime."  Smith, 37 Cal. 4th at 741.  The degree of injury sustained by the victim is not dispositive

1  of a defendant's intent, because "a defendant may properly be convicted of attempted murder

2  when no injury results."  People v. Avila, 46 Cal. 4th 680, 702 (2009).

3

4        The jury at Petitioner's trial was instructed that, to convict him on both the attempted

5  murder and conspiracy charges, his specific intent to commit murder must have been proven

6  beyond a reasonable doubt.  (CT 212-13, 216-17.)  The jury also was instructed about the

7  differences between, and meaning of, direct and circumstantial evidence, as well as regarding

8  inferences.  (CT 181-82.)  Further, the jury was instructed that the testimony of one witness

9  regarding a particular fact, if credible, is sufficient to prove that fact.  (CT 188.)  Finally, the jury

10 was instructed on the presumption of innocence accorded Petitioner, the prosecutor's burden of

11 proving him guilty beyond a reasonable doubt, and the meaning of reasonable doubt.  (CT 194.)

12 The jurors at Petitioner's trial are presumed to have followed the instructions given.  Penry v.

13 Johnson, 121 S. Ct. 1910, 1922 (2001); Weeks v. Angelone, 120 S. Ct. 727, 732 (2000).  There

14 is nothing in the record to overcome that presumption.  Thus, by its verdict, the jury at Petitioner's

15 trial concluded that he possessed the requisite intent to kill Martinez.

16

17       The evidence, when viewed in the light most favorable to the prosecution as required,

18 shows that a rational factfinder could have determined that Petitioner:  was present from the

19 moment that Martinez and the tree men left the home in Bellflower until she was left in the

20 canyon and likely presumed dead; never questioned the events or tried to prevent them; without

21 prompting, assisted Meraz in tying Martinez's hands; without prompting or instruction, other than

22 with respect to injection location, injected Martinez five to ten times in the neck; kicked and beat

23 Martinez when she was lying on the ground; stood nearby when Ayala sliced Martinez's throat

24 several times; and when the men realized that Martinez was not dead, climbed down the cliffside

25 and stabbed her behind her ear and above her collarbone twice.  The prosecution presented this

26 evidence through Martinez's testimony, and the defense did not present any evidence to

27

28

1  contradict it.[5]

2

3      Here, Petitioner simply posits alternative inferences the jury could have drawn from this

4  evidence that, if actually drawn, might have given rise to reasonable doubt.  Critically, however,

5  he does not show that it was unreasonable for the jurors to infer, based on the circumstances

6  outlined above and Petitioner's conduct, that Petitioner possessed the intent to kill.  Indeed, as

7  the California Court of Appeal observed (Lodg. No. 6 at 4-5), stabbing someone (who already has

8  been beaten, rendered briefly unconscious, and thrown off a cliff) in the neck multiple times and

9  then leaving her, alone and bleeding, at the base of a canyon gives rise to an inference of the

10  intent to kill.  *See* Avila, 46 Cal. 4th at 701-02 (when defendant repeatedly attempted to stab the

11  unarmed and trapped victim, and succeeded in stabbing him in the arm and leg, this "evidence

12  alone is substantial evidence of defendant's intent to kill").  Petitioner's arguments reflect a classic

13  instance of a litigant asking this Court to reweigh the evidence and usurp the jury's findings, which

14  are supported by the evidence and reasonable, and to replace these findings of the trier of fact

15  with the Court's own contrary findings -- something a federal habeas court cannot do under

16  *Jackson*.

17

18      "A due process claim based on insufficiency of the evidence can only succeed when,

19  viewing all the evidence in the light most favorable to the prosecution, no rational trier of fact

20  could have found the essential elements of the crime beyond a reasonable doubt."  Emery, 643

21  F.3d at 1213.  That standard is not satisfied here.  It was not objectively unreasonable for the

22  California Court of Appeal to conclude that a rational trier of fact, when viewing the evidence in

23  the light most favorable to the prosecution, could have found beyond a reasonable doubt that

24  Petitioner possessed the intent to kill Martinez for purposes of his attempted murder and

25  _____

26      [5]      It is well-settled that the testimony of a single witness is sufficient to support a
conviction under the Jackson standard.  *See* United States v. McClendon, 782 F.2d 785, 790 (9th
27  Cir. 1986); United States v. Larios, 640 F.2d 938, 940 (9th Cir. 1981); *see also* Bruce, 376 F.3d
at 957-58 (finding the testimony of a victim alone, which the petitioner disputed and claimed was
28  implausible, to be sufficient under Jackson to sustain the petitioner's conviction).

conspiracy convictions.  *See* Jackson, 443 U.S. at 319; Juan H., 408 F.3d at 1275.  Even if such a conclusion was not compelled, it was a permissible conclusion in view of the evidence before the jury.  Thus, this Court is not permitted, under the Jackson standard, to find that the jury should have concluded otherwise.  Jackson, 99 S. Ct. at 2789; Bruce, 376 F.3d at 957; *see also* Drayden, 232 F.3d at 709-10 (the Court need not find that the conclusion reached by the jury was compelled, only that it rationally could have been reached).

Under the guiding standard of review, this Court must conclude that a rational trier of fact could have found that Petitioner's conduct satisfied California law with respect to the intent to kill element of the crimes of attempted murder and conspiracy.  The state court's rejection of Petitioner's claim cannot be said to be contrary to, or an unreasonable application of, the Jackson standard, and thus, deference to the state court's decision is required.  Accordingly, Section 2254(d)(1) is unsatisfied, and Petition must be denied.

Accordingly, IT IS ORDERED that:  the Petition is DENIED; and this action is dismissed with prejudice.

LET JUDGMENT ENTER ACCORDINGLY.

DATED:  March 2, 2015

_Margaret A. Nagle_

MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

21